IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KELSEY HINDS, on behalf of herself
and all others similarly situated,

      Plaintiff,

v.

HCA HEALTHCARE, INC.,

      Defendant.

Case No.: _____
JURY DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Kelsey Hinds ("Plaintiff") brings this Class Action Complaint on behalf of herself, and all others similarly situated, against Defendant HCA Healthcare, Inc. ("HCA" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to her, which are based on personal knowledge:

1.      Healthcare providers that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2.      The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their

1

lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3. HCA is the largest healthcare system in the United States,[1] providing healthcare services in over 20 states though 180 hospitals and more than 2,300 care sites.[2]

4. As a healthcare provider, HCA knowingly obtains, collects, and stores patient PII and PHI and has a resulting duty to secure, maintain, protect, and safeguard the PII and PHI that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

5. Despite HCA's duty to safeguard Plaintiff's and Class Members' PII and PHI, Plaintiff's and Class Members' PII and/or PHI in Defendant's possession was allowed to be accessed, exfiltrated, and later offered for sale by an unauthorized third-party during a data breach of one of its external storage locations used to format patient email messages, which HCA disclosed on July 10, 2023 (the "Data Breach").[3]

6. Based on the public statements of HCA to date, a wide variety of patient PII and PHI was impacted during the Data Breach, including, but not limited to: full names; city state, and Zip Code; email addresses; phone numbers; dates of birth; gender; service dates and locations; and next appointment dates.[4]

---

[1] Anna Falvey, *100 of the largest hospitals and health system in America*, Becker's Hospital Review (Feb. 28, 2023), https://www.beckershospitalreview.com/lists/100-of-the-largest-hospitals-and-health-systems-in-america-2023.html.
[2] HCA Healthcare Reports Data Security Incident, HCA Healthcare (July 10, 2023), https://hcahealthcare.com/about/privacy-update.dot ("Data Breach Notice").
[3] *Id.*
[4] *Id.*

2

7.     As a direct and proximate result of HCA's inadequate data security measures, and its breach of its duty to handle patient PII and PHI with reasonable care, Plaintiff's and Class Members' PII and PHI has been exfiltrated by a hacker and posted on a hacking forum for sale.

8.     Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9.     Plaintiff, on behalf of herself, and the Class as defined herein, brings claims for negligence, negligence *per se*, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

## PARTIES

10.     Plaintiff is an adult, who at all relevant times, is and was a resident and citizen of the State of Kansas. Plaintiff is a patient of Wesley Medical Center, which is one of HCA's facilities that was impacted by the Data Breach.

11.     Since the announcement of the Data Brach, Plaintiff has been required to spend her valuable time monitoring her various accounts and changing her passwords to the same to detect and prevent any misuses of her PII and PHI. Plaintiff would not have to undergo such time-consuming efforts but for the Data Breach.

12.     Since the announcement of the Data Breach Plaintiff has also received a significant increase in spam calls and emails as compared to prior to the Data Breach. Plaintiff has further suffered emotional distress as a result of her PII and PHI being accessed and stolen by an unauthorized third-party.

3

13.     As a result of the Data Breach, Plaintiff will continue to be at a heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

14.     Defendant HCA is a Delaware corporation with a principal place of business located at One Park Plaza, Nashville, Tennessee 37203.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

16.     This Court has personal jurisdiction over HCA because Defendant resides in this District, and at all relevant times, Defendant has engaged in substantial business activities in the State of Tennessee.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Defendant resides in this District, and a substantial part of the acts, omissions, and events giving to the claims occurred in this District.

## FACTUAL BACKGROUND

A.     **HCA and the Services it Provides.**

18.     HCA bills itself "[a]s one of the nation's leading providers of healthcare services."[5] HCA is comprised of 182 hospitals and more than 2,300 care sites, including "surgery centers, freestanding ERs, urgent care centers, diagnostic and imaging centers, walk-in clinics and physician clinics."[6]

---

[5] *Who We Are*, HCA Healthcare, https://hcahealthcare.com/about/ (last visited July 25, 2023).
[6] *Id.*

4

19.     Upon information and belief, while administering healthcare services to patients, HCA receives, maintains, and handles patient PII and PHI. Indeed, in order to receive healthcare services from HCA, Plaintiff and Class Members must directly or indirectly entrust HCA with their sensitive and confidential PII and PHI and therefore reasonably expect that HCA will safeguard their PII and keep their PHI confidential.

20.     As a custodian of Plaintiff's and Class Members' PII and PHI, HCA assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

21.     Despite HCA's duty to protect its patients' PII and PHI from unauthorized disclosure, Defendant nevertheless employed inadequate data security measures to protect and secure the PII and PHI entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI stored in one of HCA's external storage locations.

**B.      HCA Knew the Risks of Storing Valuable PII and PHI.**

22.     HCA was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

23.     HCA also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

24.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, Excellus Health Plan, Blackbaud, and many others.

25.     PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

26.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[8]

27.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[9]

28.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[10] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[8] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.
[9] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited July 25, 2023).
[10] *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited July 25, 2023).

reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[11]

29.     Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it easily – making the industry a growing target."[12]

30.     Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[13]

31.     Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[14]

32.     In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700

---

[11] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.
[12] *Id.*
[13] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited July 25, 2023).
[14] *Id.*

7

of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[15]

33.    The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[16] The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves HCA's patients especially vulnerable to various forms of fraud.

34.    Indeed, even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

35.    Based on the value of its patients' PII and PHI to cybercriminals, HCA knew or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. HCA failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

---

[15] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last visited July 25, 2023).
[16] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

**C.      HCA Breached its Duty to Protect Patient PII and PHI.**

36.      On July 5, 2023, Databreaches.net reported that a threat actor began selling data belonging to HCA on a forum used to leak and sell stolen data.[17] The forum post included samples of the stolen database, which the threat actor claimed consisted of 17 files and 27.7 million patient records created between 2021 and 2023.[18]

37.      The threat actor's forum post further indicated that HCA had until July 10, 2023 to "meet the demands" and after HCA did not respond, the threat actor began selling the complete database, with others expressing interest in purchasing the stolen data.[19]

38.      Databreaches.net later confirmed that the threat actor selling the stolen information was the same individual who had stolen the information from HCA.[20]

39.      On July 10, 2023, HCA confirmed that the leaked database was authentic, indicating that the 27 million rows of data represented approximately "11 million HCA Healthcare patients."[21]

40.      In its announcement confirming the Data Breach, HCA stated that that the information the threat actor stole was from an "external storage location" used to format patient

---

[17]  Dissent, *DEVELOPING: HCA Healthcare patient data for sale on hacking forum*, DataBreaches.net (July 5, 2023), https://www.databreaches.net/developing-hca-healthcare-patient-data-for-sale-on-hacking-forum/
[18]  *Id.*; Bill Toulas, *HCA confirms breach after hacker steals data of 11 million patients*, BleepingComputer (July 11, 2023), https://www.bleepingcomputer.com/news/security/hca-confirms-breach-after-hacker-steals-data-of-11-million-patients/
[19] Toulas, *supra* note 18.
[20]  Dissent, *HCA Healthcare releases statement while hacker puts data up for sale on deep web (update1)*, DataBreaches.net (July 10, 2023), https://www.databreaches.net/hca-healthcare-releases-statement-while-hacker-puts-data-up-for-sale-on-deep-web/.
[21] *Data Breach Notice*, *supra* note 2.

9

email messages.[22] HCA did not explain whether HCA or one of its vendors controls and maintains the external storage location.

41. The information stolen during the Data Breach includes a wide variety of patient information, including but not limited to: full names; city state, and Zip Code; email addresses; phone numbers; dates of birth; gender; service dates and locations; and next appointment dates. [23]

42. This stolen information is valuable to threat actors who can use it to conduct phishing attacks and other scams, as well as launch social engineering attacks against Plaintiff and Class Members.[24] HCA acknowledged as much, "encourag[ing] patients to remain vigilant in identifying calls, emails, or SMS texts which appear to be spam or fraudulent."[25]

43. Importantly, non-critical systems, such as HCA's external storage system are often not secured at the same level critical patient care systems might be, even though a substantial amount of the data is still sensitive and should therefore be treated as such.

44. The Data Breach is the direct and proximate result of HCA's failure to implement reasonable data security measures to safeguard the PII and PHI contained in its external storage system.

**D. HCA is Obligated Under HIPAA to Safeguard Patient PHI.**

45. HCA is required by the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq*. ("HIPAA") to safeguard patient PHI.

46. HCA is an entity covered by HIPAA, which sets minimum federal standards for privacy and security of PHI.

---

[22] *Id.*
[23] *Id.*
[24] Toulas, *supra* note 18.
[25] *Data Breach Notice*, *supra* note 2.

10

47. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

48. Under 45 C.F.R. §160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media"; "[m]aintained in electronic media"; or "[t]ransmitted or maintained in any other form or medium."

49. Under 45 C.F.R. §160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual"; or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

50. HIPAA requires HCA to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

51. While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

52.     As such, HCA is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

53.     Given the application of HIPAA to HCA, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive medical treatment, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**E.     FTC Guidelines Prohibit HCA from Engaging in Unfair Acts or Deceptive Practices.**

54.     HCA is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

55.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[26]

56.     The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no

---

[26] *Start with Security – A Guide for Business*, U.S. FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf    (last visited on July 25, 2023).

longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[27]

57.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[28]

58.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.     HCA failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

60.     HCA was at all times fully aware of its obligations to protect the PII and PHI of its patients because of its position as a healthcare provider, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.      Plaintiff and Class Members Suffered Damages.**

---

[27] *Protecting Personal Information: A Guide for Business*, U.S. FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on July 25, 2023).
[28] *Id.*

13

61.     For the reasons mentioned above, HCA's conduct, which allowed the Data Breach to occur, caused Plaintiff, and members of the Class, significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to (1) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (2) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

62.     Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

63.     As a result of HCA's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII and PHI.

64.     From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[29]

65.     With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[30]

---

[29] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4 (Mar. 7, 2023), https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.

[30] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTH IT SEC. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

66. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[31]

67. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[32]

68. Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[33]

69. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

70. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

## CLASS ACTION ALLEGATIONS

71. Plaintiff brings this class action on behalf of herself, and all other individuals who are similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

72. Plaintiff seeks to represent a class of persons to be defined as follows:

---

[31] *Id.*

[32] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[33] *Id.*

15

All individuals in the United States and its territories whose PII and/or PHI was compromised in the HCA Data Breach which was announced on or about July 10, 2023 (the "Class").

73.     Excluded from the Class are HCA, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

74.     This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when she moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

75.     **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through HCA's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 11 million individuals.

76.     **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

    a.      Whether HCA had a duty to protect the PII and PHI of Plaintiff and Class Members;

    b.      Whether HCA was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

    c.      Whether Plaintiff and Class Members are entitled to damages as a result of HCA's wrongful conduct; and

16

        d.      Whether Plaintiff and Class Members are entitled to restitution as a result of HCA's wrongful conduct.

77.    **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all patients of Defendant, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

78.    **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

79.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, expense, and promote uniform decision-making.

80.    **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example,

HCA's liability and the fact of damages is common to Plaintiff and each member of the Class. If HCA breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

81. **Injunctive Relief:** HCA has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23(b)(2).

82. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through HCA's books and records.

<u>**FIRST CAUSE OF ACTION**</u>
**NEGLIGENCE**
**(Plaintiff on Behalf of the Class)**

83. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

84. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

85. HCA's duty to use reasonable care arose from several sources, including but not limited to those described below.

86. HCA has a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By receiving, maintaining, and handling PII and PHI that is routinely targeted by criminals for unauthorized access, HCA was obligated to act with reasonable care to protect against these foreseeable threats.

18

87. HCA's duty also arose from Defendant's position as a healthcare provider. HCA holds itself out as a trusted provider of healthcare services, thereby assuming a duty to reasonably protect the information it obtains from its patients. Indeed, HCA, who receives, maintains, collects, and handles PII and PHI from its patients, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

88. HCA breached the duties owed to Plaintiff and Class Members and was thus negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

89. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

90. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

    a.    Theft of their PII and/or PHI;

    b.    Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.    Costs associated with purchasing credit monitoring and identity theft protection services;

    d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

    g.    Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

20

h.  Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.  Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

91.  As a direct and proximate result of HCA's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(Plaintiff on Behalf of the Class)**

92.  Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

93.  Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of HCA's duty.

94.  HCA violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. HCA's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI entrusted to it from its patients.

21

95. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

96. HCA's violation of Section 5 of the FTC Act constitutes negligence *per se*.

97. HCA is an entity covered under the HIPAA, which sets minimum federal standards for privacy and security of PHI.

98. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, HCA had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

99. Specifically, HIPAA required HCA to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

100. HCA violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI.

101. Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients of HCA.

102. HCA's violation of HIPAA constitutes negligence *per se*.

103. The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and HIPAA were intended to guard against.

104.     As a direct and proximate result of HCA's negligence, Plaintiff and Class Members have suffered injuries, including:

a.     Theft of their PII and/or PHI;

b.     Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c.     Costs associated with purchasing credit monitoring and identity theft protection services;

d.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.     The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.     Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

23

h.   Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.   Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

105.   As a direct and proximate result of HCA's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(Plaintiff on Behalf of the Class)**

106.   Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

107.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

108.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that HCA's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her

24

PII and PHI and remains at imminent risk that further compromises of her PII and/or PHI will occur in the future.

109.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.    HCA owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

      b.    HCA breached and continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

110.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

111.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at HCA. The risk of another such breach is real, immediate, and substantial. If another breach at HCA occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

112.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

113.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at HCA, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all other similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    For damages in an amount to be determined by the trier of fact;

D.    For an order of restitution and all other forms of equitable monetary relief;

E.    Declaratory and injunctive relief as described herein;

F.    Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest on any amounts awarded; and

H.    Awarding such other and further relief as may be just and proper.

26

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: August 2, 2023

Respectfully submitted,

s/ David A. McLaughlin
David A. McLaughlin, Esq. (015561)
**901ATTORNEYS, LLC**
200 Jefferson Avenue, Suite 900
Memphis, TN 38103
Telephone: (901) 671-1551
Fax: (901) 671-1571
David@901Attorneys.com

Gary F. Lynch*
Nicholas A. Colella*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com
nickc@lcllp.com

*pro hac vice forthcoming*

*Attorneys for Plaintiff*